## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ATUL CHOJAR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:17-CV-3208 |
| ANGIE'S LIST, INC., THOMAS R. EVANS, GEORGE D. BELL, MARK BRITTO, SCOTT A. DURCHSLAG, ANGELA R. HICKS BOWMAN, MICHAEL S. MAURER, DAVID B. MULLEN, MICHAEL D. SANDS, H. ERIC SEMLER, and SUSAN THRONSON, | ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | | |

Plaintiff Atul Chojar ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Angie's List, Inc. ("Angie's List" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Angie's List, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Angie's List, IAC/InterActiveCorp ("Parent"), and IAC's HomeAdvisor ("Merger Sub," and together with Parent, "IAC").

2.      On May 1, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to either (i) one share of ANGI Homeservices Inc. Class A common stock or (ii) $8.50 in cash for each share of Angie's List common stock they own (the "Merger Consideration").  Elections to receive the cash consideration by Angie's List shareholders will be subject to the proration procedures set forth in the Merger Agreement, such that Angie's List shareholders will receive in the aggregate no more than $130 million in cash. Accordingly, depending on the elections made by the other shareholders of Angie's List, unless shareholders elect to receive exclusively share consideration they may receive share consideration and cash consideration in a proportion different from what they request on their election form. Upon completion of the Merger, Class A shares of ANGI Homeservices Inc. are expected to be listed on NASDAQ under the current Angie's List ticker symbol, "ANGI" (the "Combined Company").

3.      On August 30, 2017, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Company's financial advisors, Allen & Company LLC, ("Allen & Company") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch" and together with Allen &

Company the "Financial Advisors"), in support of their fairness opinions.

6.      The special meeting of Angie's List shareholders to vote on the Proposed Merger is scheduled for September 29, 2017. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Angie's List shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

effect in this District; (ii) Angie's List maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, an Angie's List stockholder.

12.     Defendant Angie's List is a Delaware corporation and maintains its headquarters at 1030 East Washington Street, Indianapolis, Indiana 46202. The Company operates a nationwide, local services consumer review service and marketplace. Angie's List's common stock trades on the NASDAQ under the ticker symbol "ANGI".

13.     Individual Defendant Thomas R. Evans is a director of Angie's List and is the Chairman of the Board.

14.     Individual Defendant Scott A. Durchslag is a director of Angie's List and is the President and Chief Executive Officer of the Company.

15.     Individual Defendant George D. Bell is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Mark Britto is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Angela R. Hicks Bowman is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Michael S. Maurer is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant David B. Mullen is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Michael D. Sands is, and has been at all relevant times, a director of the Company.

21.     Individual Defendant H. Eric Semler is, and has been at all relevant times, a director of the Company.

22.     Individual Defendant Susan E. Thronson is, and has been at all relevant times, a director of the Company.

23.     The parties in paragraph 12 through 22 are referred to collectively as Defendants.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Angie's List (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of August 25, 2017, there were approximately 61,292,181 shares of Angie's List common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Angie's List will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

       i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

       ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

       iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

       c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

       d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

       e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

       f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

       g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      IAC's Merger Consideration is Inadequate.**

26.     Angie's List operates a national local services consumer review service and marketplace. As of December 31, 2016, the Company helped facilitate transactions between over five million members and its collection of service providers in over 700 categories of service nationwide. Its tools, services and content across multiple platforms enables consumers to research, shop for and purchase local services for needs, as well as rate and review the providers of these services across the United States. Its ratings and reviews assist its members in identifying and hiring the provider for their local service needs. Its services include member services and service provider services. It compiles a breadth of relevant, member-generated ratings and reviews that provide insights, which could otherwise be difficult for consumers to obtain on their own. Its primary source of service provider revenue is term-based sales of advertising to service providers.

27.     The Merger Consideration is inadequate compensation for Angie's List shareholders. Indeed, the $8.50 Merger Consideration represents a 21% *discount* to Angie's List's 52-week high trading price of $10.76. Further, both Allen & Company and BofA Merrill Lynch valued the Company at higher price than the Merger Consideration in their valuation analyses. Both Financial Advisors calculated an implied present value per share of up to $9.40, a 11% premium to the Merger Consideration.

28.     Further, on May 2, 2017, Angie's List announced positive financial results for the 2017 first quarter, exceeding earnings projections. First quarter net income was $2.0 million, as compared to a net loss of $4.6 million for the first quarter of 2016, and adjusted EBITDA was $10.7 million, as compared to $4.8 million for the first quarter of 2016. Gross member additions of 860,000, were up 357% from 188,000 in the first quarter of 2016, bringing the total membership

count to 5.7 million as of the end of the quarter. President and CEO Scott Durchslag announced:

> [T]he year is off to a good start, with key leading indicators moving in the right direction. We added 860,000 gross members in the quarter on significantly lower year over year marketing spend, and in March, we had the highest month of traffic to our website in company history. Member engagement, service provider backlog and sales productivity all improved sequentially as our freemium model continued to gain traction with our customers. We also made great progress realizing the cost improvements we put in place at the end of last year. As a result, we improved to profitability from a net loss in the year ago quarter. While it will take time to reignite organic revenue growth, we are seeing the positive changes in new member growth, member engagement, originations bookings and service provider contract value backlog that we anticipated from our freemium strategy.

29.     Most recently, on July 26, 2017, the Company showed continued signs of growth in the Second Quarter of 2017 Results. Total members climbed to 6.4 million by June 30, 2017, up from 3.3 million members at June 30, 2016. Gross member additions were up to 0.9 million, up 229% from 0.3 million in the second quarter of 2016. Durchslag commented:

> We achieved several key milestones this quarter. We surpassed six million members, nearly doubling our base from a year ago. We also had the highest number of visits to our site in the history of Angie's List. This progress speaks to the strength of our brand and the appeal of our freemium offer. Our top priorities continue to be engaging customers and improving operating efficiency. We updated our member mobile app to deliver a new user experience, and we took action to reduce expenses, leading to a year over year decline in selling costs and operations and support expense.

30.     Finally, since the Proposed Merger was announced, financial analysts at Oppenheimer have downgraded the Company in response to the low Merger Consideration. The $8.50 Merger Consideration came in below Angie's List's price target. It is important to note that price targets are a predictive valuation of what a stock is worth on its own.[1] They do not account

---

[1] See http://www.investopedia.com/terms/p/pricetarget.asp

for premiums associated with a merger or takeover. A "take-out price", or the price that analysts predict in the event a merger or takeover, would include those premiums and be significantly higher.

31.     In sum, the Merger Consideration inadequately compensates Angie's List shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that $8.50 per share is not fair compensation for Angie's List shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## II.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers.

32.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Angie's List.

33.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Angie's List shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) solicit, initiate or knowingly facilitate or knowingly encourage (including by furnishing confidential information) any inquiries regarding, or the making, submission or announcement by any person of any proposal or offer that constitutes, or would reasonably be expected to lead to, a Company Takeover Proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding a Company Takeover Proposal, or furnish to any other person (other than IAC and its representatives) any information relating to Angie's List or any of its subsidiaries, or afford access to the business, properties, assets, books or records of

Angie's List or any of its subsidiaries to any person (other than IAC and its representatives), in each case in connection with or for the purpose of encouraging or facilitating a Company Takeover Proposal (other than to refer the inquiring person to the non-solicitation provisions of the Merger Agreement); (iii) approve, endorse or recommend any Company Takeover Proposal or approve, endorse, recommend or enter into, or propose to approve, endorse, recommend or enter into, any letter of intent or similar document, agreement, commitment or agreement in principle providing for a Company Takeover Proposal; or (iv) resolve, propose or agree to do any of the foregoing.

34.     Additionally, the Merger Agreement grants IAC recurring and unlimited matching rights, which provides IAC with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three business days to negotiate with Angie's List, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

35.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that IAC can easily foreclose a competing bid.  As a result, these provisions unreasonably favor IAC, to the detriment of Angie's List's public shareholders.

36.     Lastly, the Merger Agreement provides that Angie's List must pay IAC a termination fee of $20 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Angie's List shareholders with a superior offer.

37.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all

or a significant interest in the Company.

38.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Angie's List's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## III.     The Proxy Is Materially Incomplete and Misleading.

39.     On August 30, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

40.     First, the Proxy fails to disclose the unlevered free cash flow projections[2] for both Angie's List and IAC HomeAdvisor Business.  See Proxy 111. These unlevered free cash flows are material to the Company's shareholders. Indeed, both Financial Advisors specifically utilized these unlevered free cashflows, prepared by Angie's List management, in their individual discounted cash flow valuations. Investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in

---

[2] Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows?  Without unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

41.    Adjusted EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[3]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[4] As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the unlevered free cash flow projections are material and their omission renders the projections included in the Proxy misleading.

42.    The omission of the above-referenced projections renders the financial projections included on page 111 of the Proxy materially incomplete and misleading.  If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough.  With regard

---

[3]    Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[4]    Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

43.    Further, the Proxy fails to provide material information concerning the Company's included financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including Adjusted EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

44.    When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

45.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Angie's List has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for

GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[5]

46.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[6] On May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[7] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

47.     In order to make the projections included on pages 111 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

48.     At the very least, the Company must disclose the line item projections for the

---

[5]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[6]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[7]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

financial metrics that were used to calculate the non-GAAP measures, including Adjusted EBITDA (Adjusted EBITDA excludes the impact of certain items and as such is not in accordance with GAAP. Adjusted EBITDA means earnings before interest, income taxes, depreciation, amortization, non-cash stock-based compensation expense, asset impairment charges and other one-time items, as applicable, and, in the case of the HomeAdvisor Business, includes shared services expenses).  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading

49.     Angie's List regularly performs non-GAAP reconciliations in their earnings report press releases issued to shareholders. In fact, the Company specifically performed line item GAAP reconciliations for Adjusted EBITDA to GAAP net income in their Second Quarter 2017 Results release on July 26, 2017:

**Reconciliation of net income (loss) to Adjusted EBITDA[1]**

| | | | | |
|---|---:|---:|---:|---:|
| Net income (loss) | $ 8,948 | $ 14,150 | $ (7,857) | $ 10,243 |
| Income tax expense | 7 | 16 | 43 | 44 |
| Interest expense, net | 1,335 | 591 | 4,720 | 2,971 |
| Depreciation and amortization | 4,040 | 1,611 | 13,148 | 6,402 |
| Non-cash stock-based compensation expense | 3,214 | 2,626 | 14,744 | 8,875 |
| Legal settlement accrual | (671) | (272) | 2,829 | (2,113) |
| Non-cash long-lived asset impairment charge | — | 892 | — | 1,578 |
| **Adjusted EBITDA[1]** | $ 16,873 | $ 19,614 | $ 27,627 | $ 28,000 |

[1] *Adjusted EBITDA is a non-GAAP financial measure.*

50.     With respect to Allen & Company's Discounted Cash Flow Analysis, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the Angie's List discount rate range of 11.5% to 12.3%; (ii) the inputs and assumptions underlying the selected range of Angie's List adjusted EBITDA multiples of 8.5x to 11.0x; (iii) the net operating loss carryforwards used to adjust the Angie's List cash flows; (iv)

the inputs and assumptions underlying the calculation of the HomeAdvisor Business discount rate range of 11.5% to 12.3%; (v) the inputs and assumptions underlying the selected range of HomeAdvisor Business adjusted EBITDA multiples of 10.0x to 14.0x; and (vi) the actual range of terminal values calculated and utilized in these Analyses.

51.    With respect to BofA Merrill Lynch's Discounted Cash Flow Analysis, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the Angie's List discount rate range of 11.5% to 14.0%; (ii) the inputs and assumptions underlying the selected range of Angie's List adjusted EBITDA multiples of 8.5x to 11.0x; (iii) the net operating loss carryforwards used to adjust the Angie's List cash flows; (iv) the inputs and assumptions underlying the calculation of the HomeAdvisor Business discount rate range of 10.0% to 13.0%; (v) the inputs and assumptions underlying the selected range of HomeAdvisor Business adjusted EBITDA multiples of 10.0x to 14.0x; and (vi) the actual range of terminal values calculated and utilized in these Analyses.

52.    These key inputs are material to Angie's List shareholders, and their omission renders the summary of the Financial Advisors' Discounted Cash Flow Analyses on pages 107-109 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For

example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

53.     With respect to the Financial Advisor's *Illustrative Has/Gets Overview*, the Proxy also fails to disclose the following key components used in the analysis: (i) the value of potential Synergies associated with the Proposed Merer; and (ii) the net impact of net operating loss carryforwards. As with the Discounted Cash Flow Analyses, this valuation analysis was performed by the Company's financial advisors, heavily relied on by shareholders, and is expected to represent a clear and accurate state of the two companies' finances. Thus, in summarizing the analysis in the Proxy, the Company must be completely transparent with the information provided. The failure to include this valuable information renders the summary of the analysis set forth in the Proxy materially incomplete and misleading

54.     With respect to the Financial Advisors' *Selected Publicly Traded Companies* and *Selected Precedent Transactions* Analyses, the Proxy fails to disclose the individual multiples the Financial Advisors calculated for each company and transaction utilized. The omission of these multiples renders the summary of these analyses and the Implied Exchange Ratio Reference Ranges materially misleading.  A fair summary of Companies and Transactions analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker

applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

55.     With respect to the Financial Advisors' *Analyst Price Targets*, the Proxy fails to disclose the individual price targets they reviewed. The omission of these individual targets renders the corresponding summary materially misleading. Further, the Financial Advisors applied a steep discount rate to unfairly lower the already deflated values. *See supra* ¶29. A fair summary of price targets requires the disclosure of the individual targets observed from each equity research analyst; merely providing the range or inappropriate calculations based on a range is insufficient, as shareholders are unable to assess whether the bankers summarized fairly, or, instead, provided only the figures that best present the price targets in light of to the Merger Consideration, i.e. as low as possible.

56.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act, Rule 14a-9, and 17 C.F.R. § 244.100 Promulgated Thereunder)**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

59.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

60.   SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

61.   The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

62.   Defendants have issued the Proxy with the intention of soliciting shareholder

support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Financial Advisors in support of their fairness opinions.

63. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

64. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the Financial Advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by the Financial Advisors as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

65. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants

were required to review the Financial Advisors analyses in connection with their receipt of the fairness opinions, question the Financial Advisors as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

66.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

67.     Angie's List is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

68.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

69.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

71.     The Individual Defendants acted as controlling persons of Angie's List within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Angie's List, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

72.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

74.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

input on the content of those descriptions.

75.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

76.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

77.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 11, 2017

Respectfully submitted,

By: */s/  William N. Riley*

**MONTEVERDE & ASSOCIATES PC**

Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

**RILEY WILLIAMS & PIATT, LLC**

William N. Riley, Atty. No. 14941-49
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN  46204
Tel: (317) 633-5270
Fax: (317) 426-3348
Email: wriley@rwp-law.com

*Attorneys for Plaintiff*